Kevin R. Budner (State Bar No. 287271)
kbudner@lchb.com
Alison C. Fraerman (State Bar No. 351981)
afraerman@lchb.com
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: 415.956.1000
Facsimile: 415.956.1008

Attorneys for Plaintiff
Allen Gwynn Chevrolet, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ALLEN GWYNN CHEVROLET, INC., individually and on behalf of all others similarly situated,

Plaintiff,

v.

GENERAL MOTORS LLC, a Delaware limited liability company,

Defendant.

**CASE NO. 2:26-CV-6691-RGK-SK**

**FIRST AMENDED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS

**Pages**


NATURE OF THE ACTION .......... 2
THE PARTIES .......... 5
I. Plaintiff .......... 5
II. Defendant .......... 5
JURISDICTION AND VENUE .......... 5
FACTUAL BACKGROUND .......... 6
I. GM's Nation-Wide Franchise Network. .......... 6
II. Many states, including California, passed laws to protect dealers from underpayment on warranty work. .......... 8
III. GM has systematically undercompensated its dealers through illegal parts reimbursement practices. .......... 10
A. The No Cost Scheme: GM Provides Certain Warranty Parts at "No Cost" to Evade its Retail Rate Reimbursement Obligations. .......... 10
B. The Reduced Price Scheme: GM Artificially Reduces the List Price of Certain Warranty Parts to Minimize Payments to Dealers. .......... 12
IV. Plaintiff and the Dealer Class Suffered Significant Financial Harm .......... 14
CLASS ACTION ALLEGATIONS .......... 15
I. Numerosity – Fed. R. Civ. P. 23(a)(1) .......... 15
II. Predominance of Common Issues – Fed. R. Civ. P. 23(a)(2) & (b)(3) .......... 15
III. Typicality – Fed. R. Civ. P. 23(a)(3) .......... 17
IV. Adequacy – Fed. R. Civ. P. 23(a)(4) .......... 17
V. Superiority – Fed. R. Civ. P. 23(b)(3) .......... 17
CLAIMS FOR RELIEF .......... 18
COUNT I: VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW Cal. Bus. & Prof. Code §§ 17200 *et seq.* (On Behalf of Plaintiff and the Class) .......... 18
I. Unlawful Prong .......... 18
II. Unfair Prong .......... 19
COUNT II: BREACH OF CONTRACT (On Behalf of Plaintiff and the Class) .......... 21
COUNT III: VIOLATION OF THE AUTOMOBILE DEALERS' DAY IN COURT ACT 15 U.S.C. §§ 1221 *et seq.* (On Behalf of Plaintiff and the Class) .......... 22
PRAYER FOR RELIEF .......... 24
DEMAND FOR JURY TRIAL .......... 25

Plaintiff Allen Gwynn Chevrolet, Inc. ("Plaintiff"), individually and on behalf of all others similarly situated, by and through its undersigned attorneys, brings this Class Action Complaint against Defendant General Motors LLC ("GM" or "Defendant"), and alleges as follows based, where applicable, on personal knowledge, information and belief, and the pre-filing investigation of counsel:

## NATURE OF THE ACTION

1. Plaintiff brings this class action on behalf of GM-franchised new motor vehicle dealers in California to recover damages for GM's systematic failure to compensate its franchised dealers at the rates required by California law for warranty and recall repair work.

2. California law mandates that manufacturers "fairly compensate each of its franchisees" for parts and labor used in warranty work that manufacturers have agreed to provide to customers at no cost. Cal. Veh. Code § 3065(a)-(b). In particular, Section 3065 of the California Vehicle Code requires manufacturers, including GM, to pay their franchised dealers the "retail parts rate" markup—typically 75% to 85%—for all parts used in warranty, recall, or other no-cost repairs or service. *Id.* ("[A] franchisor shall compensate each of its franchisees for parts and labor at rates equal to the franchisee's retail labor rate and retail parts rate.").

3. This means that if a part costs $100, for example, GM must compensate dealers $183 dollars (using Plaintiff's 83.12% retail parts rate for illustrative purposes[1]): $100 to reimburse the cost of the part plus $83.12 in markup. Or, alternatively, if that same part is provided to dealers at no cost, GM must compensate dealers only for the $83.12 retail parts markup.[2] This ensures that

---

[1] Plaintiff's retail parts rate—established using the methodology set forth in Section 3065.2—may have varied slightly during the relevant time period.

[2] As explained further below, the law includes detailed provisions governing dealer compensation if the franchisor provides the part to the dealers at no cost or at a reduced cost. Cal. Veh. Code § 3065.2(g)(1)-(2).

dealers, who may not refuse warranty and recall repair work, profit from warranty services in much the same way that they would profit from similar, non-warranty work.

4. From the very beginning, however, GM has ignored or subverted the California Vehicle Code to avoid paying dealers their due. Indeed, for several years, GM did not pay its dealers any retail markup at all on a host of high-value parts, most notably lithium-ion batteries for electric vehicles. Instead of a percentage-of-the-part markup—as required by law—GM imposed "no cost" "Exchange Programs" through which it paid dealers only a flat, administrative handling fee that fell far below the dealer's retail parts rate. This facial violation of Section 3065—referred to herein as the "No Cost Scheme"—cost dealers (including Plaintiff) a lot of money.

5. The cost to replace a lithium-ion battery for a typical electric vehicle ("EV"), for example, typically ranges between $10,000 to $20,000 (and in some cases even higher).[3] Again, using Plaintiff's retail rate markup of 83.12% on a $15,000 battery, a GM dealer would be entitled to $12,468 above cost under Section 3065. Yet, under GM's Exchange Programs, GM dealers received a flat EV battery "handling fee" of just $1,120—less than 10% of the total the dealer was actually due.

6. Unsurprisingly, many dealers complained, and in 2024 GM abandoned the flat-fee approach in a tacit admission of the program's illegality. Unfortunately, the practice that replaced it was no better for the dealers.

---

[3] Lithium-Ion Batteries for Electric Vehicles: 2025 Buyer's & Owner's Guide, Recharged, available at: https://recharged.com/articles/chevrolet-bolt-ev-battery-replacement-cost (estimating range of $8,000 to 19,000); Lithium-Ion Battery Pack Prices Fall to $108 Per Kilowatt-Hour, Despite Rising Metal Prices: BloombergNEF, BloombergNEF (Dec. 29, 2025) available at: https://about.bnef.com/insights/clean-transport/lithium-ion-battery-pack-prices-fall-to-108-per-kilowatt-hour-despite-rising-metal-prices-bloombergnef/ (estimating global average battery-pack price around $108 per kWh). EV batteries have capacities of between 40 and 120 kWh (*see* Recharged, *supra*), so at $108 per kWh, the cost of a battery could be anywhere from $4,320 to $12,960.

7. Starting on January 1, 2024, and continuing through today, GM pays its dealers their retail parts markup, but it artificially reduces the price of high-value parts in its catalogs. This, in turn, reduces the compensation to dealers under the percentage-based retail rate formula. This practice is referred to herein as the Reduced Price Scheme.

8. Again, EV batteries provide illustrative examples. GM now offers some Chevrolet Bolt batteries for warranty replacement for as little as $520. This means that dealers replacing those batteries under warranty receive a retail parts markup of just $432.25 (using an 83.12% retail parts rate). But the true value of the batteries is much, much higher. Indeed, on information and belief, that same battery is offered to dealers for out-of-warranty work for $11,375 (and sold to the public with an MSRP of $16,250)—meaning that dealers are losing thousands of dollars on every battery.

9. Under Section 3065, dealers are entitled to their retail part rate markup on the true cost of the part, not some fictitious, lower price that GM devised to shortchange dealers. Plaintiff and the Class earned the retail parts rate markup on the true cost of the parts used to perform warranty work.

10. This Reduced Price Scheme, like the No Cost Scheme before it, has cost dealers millions and violates California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*; Section 3065 of California's Vehicle Code; the common law of breach of contract, and the Automobile Dealers' Day in Court Act, 15 U.S.C. §§ 1221 *et seq.*

11. Plaintiff brings this action under these statutes to recover these losses, and seeks restitution, restitutionary disgorgement, and damages on behalf of itself and all similarly situated GM franchised dealers in California.

## THE PARTIES

### I. Plaintiff

12. Plaintiff Allen Gwynn Chevrolet, Inc. is a corporation organized and existing under the laws of the State of California, with its former principal place of business in Glendale, California. Plaintiff operated a GM-franchised dealership authorized to sell and service GM vehicles under the Chevrolet brand name until October 28, 2025, when Plaintiff sold substantially all of its assets to another Chevrolet dealer.[4] Plaintiff is a citizen of the State of California.

### II. Defendant

13. Defendant General Motors LLC is a global automobile manufacturer and dealership franchisor that designs, engineers, and manufactures vehicles under the brand names Buick, Cadillac, Chevrolet, and GMC. GM is a Delaware limited liability company with its principal place of business in Detroit, Michigan. The sole member of GM is General Motors Holdings, LLC. The sole member of General Motors Holdings, LLC is General Motors Company, a Delaware corporation with its principal place of business in Michigan. GM is therefore a citizen of Delaware and Michigan for purposes of diversity jurisdiction.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) (the Class Action Fairness Act) because this is a class action in which: (a) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs; (b) there are more than 100 members in the proposed class; and (c) at least one member of the proposed class is a citizen of a

---

[4] Under the Asset Purchase Agreement, the buyer purchased Plaintiff's "work-in-progress" repair work, which included repair orders that had not yet been completed, but did not include any rights or obligations associated with already completed warranty repair work. The right to seek further compensation from GM for completed warranty repair work is not listed as a Purchased Asset, and, per the terms of the agreement, any "other assets" not listed as Purchased Assets were excluded from the sale and retained by Plaintiff.

state different from the Defendant. Plaintiff is a citizen of California, and GM is a citizen of Delaware and Michigan.

15. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as to claims arising under the Automobile Dealers' Day in Court Act, 15 U.S.C. §§ 1221 *et seq*., and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's state-law claims that form part of the same case or controversy.

16. This Court has specific personal jurisdiction over GM. GM regularly transacts business in the State of California. GM maintains an extensive network of franchised dealers throughout California. GM's franchise agreements with California dealers, including Plaintiff's former franchise, govern the sale and service of GM vehicles in California. GM derives substantial revenue from vehicles sold and serviced in California. This lawsuit arises from GM's contacts with California, including the illegally low reimbursements for warranty repair parts GM made to Plaintiff and other franchise dealers in California.

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in the Central District of California, where Plaintiff's business was located during the relevant time period.

## FACTUAL BACKGROUND

### I. GM's Nation-Wide Franchise Network.

18. GM is America's largest automobile manufacturer. It makes vehicles under the brands Chevrolet, GMC, Buick, and Cadillac. Like most manufacturers, GM sells its vehicles through a nationwide network of independently owned and operated franchised dealerships. GM recognizes that its "dealers are the face of GM to our customers and valued members of the communities where they do business across America."[5]

---

[5] *GM Confirms Network of 4,500 Dealers*, F&I Showroom (Aug. 5, 2010), available at https://www.fi-magazine.com/news/gm-confirms-network-of-4500-dealers.

19. GM relies on its dealers to perform repair and service work to its customers. Although customers purchase their vehicles from a dealer, it is GM who provides them with a detailed warranty, which provides certain repairs at no cost. GM is also responsible for repairing vehicles in the event of a recall at no cost.

20. Despite being independently owned and operated, each GM dealer must enter into a uniform Dealer Sales and Service Agreement ("DSSA") with GM, which allows the dealer to sell and service GM products.

21. The purpose of the DSSA "is to promote a relationship between General Motors and its dealers that encourages and facilitates cooperation and mutual effort to satisfy customers and permits General Motors and its dealers to fully realize their opportunity for business success."[6] This extends to GM's contractual promise that each Dealer that "fulfills its obligations under its Dealer agreement," as Plaintiff did, will be permitted "a reasonable return on investment."[7]

22. Reflecting the purposes of the DSSA, the contract requires that GM will perform its contractual obligations "in a professional manner and in accordance with all laws and regulations."[8]

23. GM unilaterally sets the terms of the DSSA. *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 439 U.S. 96, 100 (1978) (noting the "vast disparity in economic power and bargaining strength" which enables manufacturers like GM "to determine arbitrarily the rules by which the two parties conduct their business affairs").

24. Among other things, the DSSA requires franchised dealers to obtain all GM vehicles and parts only from GM.[9] It also expressly requires each dealer to

---

[6] DSSA, Purpose of Agreement.
[7] DSSA, Article 4.1.
[8] DSSA, Article 5.2.1.
[9] DSSA, Article 17.5.

perform certain free repairs, like warranty or recall work, whether or not the dealer sold the particular vehicle.[10]

25. For each warranty, recall, or other obligated service or repair work that GM-franchised dealers perform, they lose the ability to (1) perform non-covered service and repair work that would generate revenue for their businesses and (2) sell the replacement part to customers at a retail rate.

26. To compensate its dealers for obligatory warranty work, GM agrees to cover the cost of parts and labor for franchised dealers' "performance of services, pre-delivery inspections and adjustments, warranty repairs, special coverage repairs, field action inspections and corrections, and transportation damage repairs."[11] Historically, however, if manufacturers refused to compensate dealers fairly for this work, the dealers would have little recourse—particularly given dealers' general reluctance to bite the hand that feeds them.

## II. Many states, including California, passed laws to protect dealers from underpayment on warranty work.

27. Because dealers lacked recourse (and leverage) to protect themselves from manufacturers, many states stepped in with legislation governing the method manufacturers must use to reimburse dealers for the costs of warranty and other no-cost repair work.[12] These statutes generally require manufacturers to compensate dealers for the cost of the labor and parts used in warranty and recall work, plus a markup based on the retail rate on the parts.

28. California is no exception, and in 2019 (through Assembly Bill No. 179, effective January 1, 2020), it enacted one of the most comprehensive dealer warranty compensation statutes in the country. Cal. Veh. Code § 3065. As discussed above, Section 3065 requires manufacturers to "adequately and fairly

---

[10] DSSA, Article 7.1.

[11] DSSA, Article 7.1.4.

[12] *See, e.g.*, N.Y. Veh. & Traf. Law § 465(1); Ala. Code § 8-20-7; Ariz. Rev. Stat. § 28-4451; Ark. Code Ann. § 23-112-310; Tex. Occ. Code Ann. § 2301.402.

compensate each of its franchisees for labor and parts used to satisfy the warranty obligations of the franchisor, including, but not limited to, diagnostics, repair, and servicing[.]" Cal. Veh. Code § 3065(a). Adequate and fair compensation is defined as the "franchisee's retail labor and retail parts rate." *Id.* § 3065(b).

29. Section 3065 establishes the specific methodology for setting retail rates. Those rates vary slightly by dealer, but a typical retail rate markup is between 75%-85% of the part value. Again, this reimbursement requirement ensures dealers receive the same fair compensation for their warranty work as they do for other work.

30. Critically, Section 3065 requires manufacturers to pay the retail parts rate markup to its dealers ***even if*** the manufacturer provides the part to the dealer at no cost or at reduced cost. *Id.* §§ 3065.2(g)(1)-(2). These provisions explain that "[i]f the franchisor furnishes a part to a franchisee at no cost" or "at a reduced cost for use in performing warranty obligations, the franchisor ***shall*** **compensate** the franchisee the amount resulting from multiplying the wholesale value of the part by the franchisee's retail parts rate . . . ."

31. The wholesale value, in turn, is defined as "the greater of:

a. The amount the franchisee paid for the part or a substantially identical part if already owned by the franchisee.

b. The cost of the part shown in a current franchisor's established price schedule.

c. The cost of a substantially identical part shown in a current franchisor's established price schedule."

*Id.* § 3065.2(g)(3) (emphasis added).

32. These "no-cost" or "reduced cost" provisions close a loophole that would otherwise allow manufacturers to avoid paying dealers the retail parts rate markup by providing them free of charge (as GM did with the exchange programs until 2024) or at an artificially reduced price (as GM did thereafter). These

provisions also make clear that, no matter the price actually paid by the dealers (if any), the retail part markup must be keyed to the parts' actual wholesale value.

33. To further bolster dealer protections, Section 3065 prohibits manufacturers from manipulating their pricing systems to shortchange dealers. *Id.* § 3065.2(f)(2)(A). ("The franchisor is prohibited from establishing or implementing a special part or component number for parts used in warranty work, if the result of the special part or component lowers compensation to the franchisee below that amount calculated pursuant to this section.").

34. Furthermore, the DSSA requires GM to comply with applicable law in executing its obligations under the contract, thus requiring GM to compensate dealers in a manner consistent with Sections 3065 and 3065.2.

35. Unfortunately, GM violated the prohibition against price manipulation outlined in Section 3065.2(f)(2)(A), depriving California franchised dealers of income earned, frustrating the purpose of the DSSA, and breaching its contractual promises.

## III. GM has systematically undercompensated its dealers through illegal parts reimbursement practices.

36. Despite Section 3065's clear mandate, GM failed to pay its California franchised dealers the statutorily required retail parts markup on certain warranty parts that GM chose initially to provide at no cost and then at an artificially deflated price.

37. GM's failure to pay the statutorily required retail parts markup has deprived its California franchised dealers of earned income under state law and the terms of the DSSA.

### A. The No Cost Scheme: GM Provides Certain Warranty Parts at "No Cost" to Evade its Retail Rate Reimbursement Obligations.

38. Under the first regime, in effect through December 31, 2023, GM created "Exchange Programs," detailed in the Service Policies & Procedures

Manual ("SPPM"), under which certain warranty parts are furnished to dealers at "no cost" and are thus deemed ineligible for retail parts markup under the SPPM (the "No Cost Scheme"). These "Exchange Parts"[13] included the following:

a. Radios and related Audio Products (including navigation and XM radios);

b. RCA (Radio Control Assembly);

c. Multi-media (DVD & CD);

d. Entertainment/Video/Infotainment Systems;

e. ICS (Infotainment Center Stack);

f. HMI (Human Machine Interface);

g. Instrument Clusters;

h. Heads-Up Displays;

i. OnStar Modules;

j. Lithium-ion batteries; and

k. Hybrid batteries

39. Under the Exchange Programs, dealers were unable to seek reimbursement for Exchange Parts. Indeed, when a dealer submitted a warranty claim through GM's Global Warranty Management System to receive its retail rate markup, the system did not allow the dealer to submit a claim for reimbursement for their retail parts markup on Exchange Parts. Instead, dealerships received reimbursement only for labor, plus an administrative flat fee. That flat fee—typically $45 for electronic components and $1,120 for lithium-ion EV batteries—was invariably lower than dealers would have received by applying a customary, percentage-based retail parts rate.

40. The Exchange Programs were the only way GM dealers could access covered parts for warranty work, which they are contractually required to perform. Dealers were required to order the Exchange Parts exclusively from GM-authorized

[13] SPPM, Section 5.6.

Electronic Service Centers ("ESCs"), which GM directed to supply warranty parts.[14]

41. Each Exchange Part was an authorized GM part, contained a GM part number that was capable of being identified in the GM parts catalog, and many of the parts were stamped with a GM trademark logo on the exterior. GM's use of ESCs to supply "Exchange Parts" did not change the fact that these were parts ultimately furnished to the dealers by GM.

42. In addition, GM controlled the ESCs, and as such, the ESCs acted as GM's agents when selling Exchange Parts to dealers. GM authorized the ESCs to act for it by establishing the Exchange Program, controlling the supply chain for Exchange Parts, and requiring its dealers to submit warranty claims for Exchange Parts through the ESCs. The ESCs fulfilled orders on behalf of GM and according to GM's instructions.

43. The Exchange Program detailed in the SPPM did not "adequately and fairly compensate[]" dealers because it did not provide dealers with the retail parts rate markup required under Section 3065(b).

44. Although GM categorized certain parts as "no-cost" Exchange Parts, these parts still had retail value. Section 3065 specifically requires manufacturers to pay franchised dealers the retail rate markup for parts that are provided at no cost. GM's No Cost Scheme constituted a systematic, statewide scheme to violate California law and avoid paying dealers their statutorily required retail markups, income the dealers earned upon completing the warranty work.

**B. <u>The Reduced Price Scheme: GM Artificially Reduces the List Price of Certain Warranty Parts to Minimize Payments to Dealers.</u>**

45. At the end of 2023, GM issued two dealer bulletins announcing that, "[e]ffective January 1, 2024, GM is changing part of the process for" both

---

[14] SPPM, Article 5.6.1-2.

"Electronic Exchange Parts" and "Lithium-ion battery packs and modules (sections and kits)" used for warranty and recall repairs.[15] Rather than dealers exchanging the parts "with no upfront cost and receiving an administrative allowance upon job completion, dealers will now order and pay for" the parts "upfront and receive their approved parts markup based on the list prices that will now be published in GM's Electronic Parts Catalog (EPC) upon submission of a claim in accordance with GM's Service Policies & Procedure Manual."

46. At first blush, this appeared to be an improvement. In reality, however, the bottom line for dealers did not improve. This is because GM artificially reduced the prices in its Electronic Parts Catalog to reduce the retail markup owed to the dealers (the "Reduced Price Scheme").

47. To take one example, a high-voltage EV battery for a 2020-2023 Chevrolet Bolt (part number 24042761) retails to the public with an MSRP of $16,250 (though it is sometimes offered on discount).[16] On information and belief, GM offered that same part to dealers for out-of-warranty repairs for $11,375. This is the true "cost" of the part, as contemplated in the California Vehicle Code. Applying an 83.12% retail part rate to this cost yields a dealer markup of $9,454.90.

---

[15] This changed practice may have been influenced by developments in similar litigation brought by a GM dealer in Georgia. *Ginn Motor Co. v. Gen. Motors LLC*, No. 1:22-CV-03773-WMR, 2023 WL 6536240, at *1 (N.D. Ga. Aug. 25, 2023). In August 2023—just before GM announced its new practice—that court held that the plaintiff had "plausibly alleged that GM's reimbursement procedures requiring dealers to use the [no cost exchange programs] to obtain GM parts is merely an effort to avoid paying dealers the retail markup for the parts in violation of" Georgia's similar dealer compensation statute. *Id.* at *6. After discovery, and with a class certification motion and competing summary judgment motions pending, the parties settled on a non-class basis, and the plaintiff dismissed the case. *Ginn*, No. 1:22-CV-03773-WMR, Dkt. 288 (N.D. Ga. April 1, 2026).

[16] *See, e.g.*, https://g.oempartsonline.com/oem-parts/gm-high-voltage-battery-24042761, https://www.gmpartsdirect.com/oem-parts/gm-high-voltage-battery-24042761?srsltid=AfmBOorheEgAYyhamF9BKgdVquZx23NI2WXUU5l6j2HQF01rjHigxF2u&utm_source=chatgpt.com, https://www.gmpartscenter.net/oem-parts/gm-high-voltage-battery-24042761, https://www.ipiparts.com/parts/gm-high-voltage-battery-24042761.

48. And yet, this same part (and/or parts substantially identical to it) is provided to dealers under the Reduced Price Scheme for just $520. Using the same 83.12% retail part rate yields a part payment to the dealer of $432.25, more than twenty times less than the dealer is owed under the law.

49. That is just one example of many. Since ending its No Cost Scheme, GM has systematically and artificially reduced the list price of its electronic parts and EV batteries to avoid paying the full, legally mandated retail parts markup owed to its dealers.

## IV. Plaintiff and the Dealer Class Suffered Significant Financial Harm.

50. GM's practices have caused substantial financial harm to Plaintiff and the Class.

51. As discussed above, the difference between the retail rate owed dealers and the prices GM actually paid dealers—including the administrative fee under the Exchange Programs and the artificially depressed retail payments after that—could be as much as $10,000 (or more) for a single EV battery.

52. More than 150,000 of those batteries were replaced nationwide as a result of various recalls, and at least thousands (likely tens of thousands), of those were replaced by Class member dealers in California. Plaintiff alone replaced more than forty EV batteries under the No Cost Scheme before January 2024 (and more after), and that does not account for all of Plaintiff's warranty work on other high-value electronic parts that were subject to the same under-compensation schemes. Needless to say, then, that while the precise amount of classwide damages cannot be ascertained without GM's records, the scope of the harm is very significant.

53. Moreover, GM dealers will continue to perform increasing volumes of warranty replacement work on electronic parts and EV batteries in the coming years. GM's electric future means these unlawful underpayments will grow in frequency and magnitude unless and until it is ordered to stop.

## CLASS ACTION ALLEGATIONS

54. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of itself and the following proposed class (the "Class"):

a. All past and current GM-franchised new motor vehicle dealers in the State of California that performed warranty or recall service and repair work using parts subject to (a) GM's No Cost Scheme from January 1, 2020, to December 31, 2023; or (b) on and after January 1, 2024, using parts subject to GM's Reduced Price Scheme.

55. Excluded from the Class are GM and its officers, directors, and employees; government entities; all persons who make a timely election to be excluded from the Class; and the judicial officers and associated court staff assigned to this case.

### I. Numerosity – Fed. R. Civ. P. 23(a)(1)

56. The members of the Class are so numerous that individual joinder of all its members is impracticable. Upon information and belief, there are several hundred GM-franchised dealers operating in the State of California. The exact number and identities of Class members can be ascertained through appropriate investigation and discovery and through GM's own records, including its DSSA contracts and warranty claims data.

### II. Predominance of Common Issues – Fed. R. Civ. P. 23(a)(2) & (b)(3)

57. This action involves common questions of law and fact, which predominate over any questions affecting individual Class Members, including, without limitation:

a. Whether GM furnished Exchange Parts under its No Cost Scheme to its California dealers within the meaning of California Vehicle Code § 3065.2(g);

b. Whether GM's No Cost Scheme violates California Vehicle Code §§ 3065 and 3065.2;

c. Whether GM's Reduced Price Scheme of basing dealer compensation on artificially reduced part prices also violates California Vehicle Code §§ 3065 and 3065.2(g);

d. Whether GM's practices constitute unlawful and/or unfair business practices under California Business and Professions Code §§ 17200 *et seq.*;

e. Whether GM's practices constitute a breach of the uniform Dealer Sales and Service Agreement;

f. Whether GM has failed to act in good faith in performing its franchise obligations by failing to compensate dealers at the rates required by law;

g. Whether GM's conduct and the terms of its relationships with dealers coerced dealers to perform warranty work without proper compensation;

h. Whether GM's warranty claims system was designed to prevent dealers from receiving their proper retail parts rate markup;

i. Whether GM's practices described herein constitute proper compensation within the meaning of California Vehicle Code § 3065;

j. Whether GM has an obligation to reimburse California dealers for Exchange Parts at their established retail warranty compensation parts rate based on the true wholesale value of such parts;

k. Whether California dealers have a vested property interest in the established retail warranty compensation parts rate based on the true wholesale value of such parts; and

l. The appropriate measure of restitution, restitutionary disgorgement, and damages.

**III. <u>Typicality – Fed. R. Civ. P. 23(a)(3)</u>**

58. Plaintiff's claims are typical of the Class. The applicable law regarding parts warranty compensation to automobile dealers applies the same to Plaintiff and all Class members operating under GM's DSSA, SPPM, No Cost Scheme and Reduced Price Scheme. Plaintiff and all Class members have been required to perform warranty and recall repairs and have been denied the appropriate retail parts rate markup compensation required by California law.

**IV. <u>Adequacy – Fed. R. Civ. P. 23(a)(4)</u>**

59. Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests are aligned with, and not antagonistic to, the interests of the Class. Plaintiff has retained counsel experienced in complex class action litigation who will vigorously prosecute this action on behalf of the Class.

**V. <u>Superiority – Fed. R. Civ. P. 23(b)(3)</u>**

60. A class action is superior to any other available method for the fair and efficient adjudication of this controversy. The answers to common questions in this class action will predominate over individual questions, and thus no other form of resolution could be superior to a class action. Requiring hundreds of GM dealers in California to individually litigate their claims over and over again would be vastly inefficient for the Class, GM, and the courts, especially when the claims all raise the same questions with the same answers. Moreover, individual litigation would raise the material risk of inconsistent judgments.

## CLAIMS FOR RELIEF

### COUNT I:
### VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW
### Cal. Bus. & Prof. Code §§ 17200 *et seq.*
### (On Behalf of Plaintiff and the Class)

61. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

62. California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*, prohibits any "unlawful, unfair, or fraudulent business act or practice."

63. GM and Plaintiff are "persons" within the meaning of the California UCL.

**I. Unlawful Prong**

64. GM's conduct is "unlawful" within the meaning of the UCL because it violates Sections 3065 and 3065.2 of the California Vehicle Code.

65. Section 3065(a) requires every franchisor to "adequately and fairly compensate each of its franchisees for labor and parts used to satisfy the warranty obligations of the franchisor."

66. Section 3065(b) requires that franchisors compensate their franchisees "for parts and labor at rates equal to the franchisee's retail labor rate and retail parts rate, as established pursuant to Section 3065.2."

67. Section 3065.2(g)(1) mandates that when a franchisor furnishes a part to a franchisee at no cost for use in performing warranty obligations, the franchisor shall compensate the franchisee the amount resulting from multiplying the wholesale value of the part by the franchisee's retail parts rate.

68. GM has violated each of these provisions by failing to pay its California dealers the full retail parts rate markup under the No Cost and Reduced Price Schemes, as described herein.

69. Section 3065.2(f)(2)(A) further prohibits a franchisor from "establishing or implementing a special part or component number for parts used in warranty work, if the result of the special part or component lowers compensation to the franchisee below that amount calculated pursuant to this section." GM's No Cost Scheme and Reduced Price Scheme violate this prohibition by segregating certain parts and providing them to dealers in a way that lowers (or eliminates) the retail part rate due to the dealers.

**II. Unfair Prong**

70. GM's conduct is "unfair" within the meaning of the UCL because GM's practice of paying flat administrative fees in lieu of the retail rate markup for the No Cost Scheme and paying the retail markup rate using the Reduced Price Scheme has substantially injured its franchised dealers, is not outweighed by any countervailing benefits to consumers or competition, and is not reasonably avoidable by the dealers. GM dealers are contractually obligated to perform warranty and recall work and had no choice but to participate in the No Cost Scheme before January 1, 2024, and have no choice but to participate in the Reduced Price Scheme on and after January 1, 2024, as the exclusive means of obtaining the required replacement parts.

71. GM's conduct is further unfair because it exploits the inherent imbalance of bargaining power between GM and its franchised dealers. While GM could choose to compensate its franchised dealers for warranty work at the rates required by law, GM instead uses its dominant position to unilaterally dictate the compensation dealers receive by establishing arbitrary, fixed rates that do not reflect the retail market price and do not compensate dealers for the revenue they lose when performing duty-bound service work.

72. As a direct and proximate result of GM's unlawful and unfair business practices, Plaintiff and the Class have suffered injury in fact and have lost money and property.

* * *

73. Plaintiff and the Class seek to restore to Plaintiff and the Class any money GM acquired or unlawfully retained through its unfair and unlawful business practices, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203.

74. Plaintiff and the Class are entitled to restitution of all amounts by which GM was unjustly enriched at the expense of its dealers.

75. Specifically, Plaintiff and the Class are owed restitution of unpaid compensation for warranty work at the retail parts rate markup based on the true wholesale value of such parts.

76. Once the California franchised dealers performed warranty work using GM-sanctioned parts, the full retail parts rate markup on the wholesale value of those parts became earned income and property to which the dealers were entitled. The California franchised dealers thus have a vested property interest in the retail warranty compensation parts rate established in California Vehicle Code Section 3065.

77. Plaintiff and the Class have a right to recover from GM the monies in GM's possession that Plaintiff and the Class earned through the warranty repair work.

78. The return to Plaintiff and the Class of the full retail parts markup is necessary to restore Plaintiff and the Class's property interest and to ensure Plaintiff and the Class are in the same position they would have been if not for GM's unfair and unlawful conduct.

79. Plaintiff pleads this claim separately as well as in the alternative to its claims for damages under Fed. R. Civ. P. 8(a)(3). Among other reasons, Plaintiff will have no adequate legal remedy if Plaintiff's claims for damages are dismissed or judgment is entered on them in favor of Defendant.

80. Additionally, Plaintiff and the Class lack an adequate remedy at law to recover or fully recover amounts and benefits subject to restitution pursuant to this cause of action. Compensatory damages resulting from legal claims, even if successful, may be calculated at less than restitution, leaving Plaintiff and the Class without the full retail parts rate markup to which they are entitled.

81. In addition, equitable remedies, including restitution and restitutionary disgorgement, may be more certain, prompt, and efficient than other legal remedies requested herein.

**COUNT II:**
**BREACH OF CONTRACT**
**(On Behalf of Plaintiff and the Class)**

82. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

83. As alleged herein, Plaintiff and Defendant have a written contract, the Dealer Sales and Service Agreement, that governs the relationship between GM Dealers and GM.

84. The DSSA is a valid and enforceable contract that entitles Plaintiff and the Class to the mutual benefit of a franchise relationship with GM, including "business success"[17] and a "reasonable return on investment."[18]

85. The DSSA requires that dealers and GM will perform their contractual obligations "in a professional manner and ***in accordance with all laws*** and regulations."[19]

86. The DSSA applicable to Plaintiff and the Class is uniform and contains the same language regarding legal compliance.

---

[17] DSSA, Purpose of Agreement.
[18] DSSA, Article 4.1.
[19] DSSA, Article 5.2.1 (emphasis added).

87. Plaintiff and the Class performed all conditions, covenants, obligations, and promises required to be performed by them pursuant to the terms of their contracts with GM, except for those that have been excused.

88. GM materially breached the DSSA by failing to pay its California dealers the full retail parts rate markup in accordance with California law, instead instituting the No Cost and Reduced Price Schemes as described herein to evade paying dealers the warranty compensation they earned and to which they are entitled. This conduct violates Sections 3065 and 3065.2 of the California Vehicle Code.

89. The provisions of the DSSA require GM to comply with all applicable law to facilitate a mutually beneficial relationship between dealers and GM, and thus GM was contractually obligated to pay California dealers the full retail parts rate markup provided for by statute.

90. As a direct and proximate result of GM's breach of its contractual obligations to Plaintiff and the Class, Plaintiff and the Class have been damaged in an amount to be determined at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT III:
## VIOLATION OF THE AUTOMOBILE DEALERS' DAY IN COURT ACT
## 15 U.S.C. §§ 1221 *et seq.*
## (On Behalf of Plaintiff and the Class)

91. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

92. The Automobile Dealers' Day in Court Act ("ADDCA"), 15 U.S.C. §§ 1221 *et seq.*, provides that "[a]n automobile dealer may bring suit against any automobile manufacturer . . . and shall recover the damages by him sustained and the cost of suit by reason of the failure of said automobile manufacturer . . . to act in good faith in performing or complying with any of the terms or provisions of the

franchise, or in terminating, canceling, or not renewing the franchise with said dealer." 15 U.S.C. § 1222.

93. GM is an "automobile manufacturer" within the meaning of the ADDCA. 15 U.S.C. § 1221(a).

94. Plaintiff and each member of the Class is an "automobile dealer" within the meaning of the ADDCA. 15 U.S.C. § 1221(c).

95. The DSSA between GM and each of its California dealers, together with the SPPM and related documents, constitutes a "franchise" within the meaning of the ADDCA. 15 U.S.C. § 1221(b).

96. The ADDCA defines "good faith" as "the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party." 15 U.S.C. § 1221(e).

97. GM has failed to act in good faith in performing its obligations under its franchise agreements with its California dealers by engaging in the following conduct:

a. Systematically refusing to compensate California dealers at the retail parts rate markup required by California Vehicle Code §§ 3065 and 3065.2 for warranty and recall parts;

b. Designing and implementing the No Cost Scheme and the Reduced Price Scheme that prevents dealers from obtaining their established retail parts rate markup on parts provided for warranty work.

98. Plaintiff and the Class were coerced to accept the conduct described above in part because of the asymmetrical business relationship with GM, wherein GM could deprive Plaintiff and other dealers of business opportunities or terminate

their franchises if the dealers failed to comply with GM's unlawful warranty compensation schemes.

99. As a direct and proximate result of GM's failure to act in good faith, and its demonstration of bad faith through coercive conduct, Plaintiff and the Class have been damaged in amounts to be proven at trial. This includes the difference between the compensation they should have received under California law and the compensation they actually received through the No Cost Scheme and the Reduced Price Scheme, together with the costs of suit.

## PRAYER FOR RELIEF

100. WHEREFORE, Plaintiff, individually and on behalf of the proposed Class, respectfully requests that this Court enter judgment in favor of Plaintiff and the Class and against Defendant, and award the following relief:

a. Certification of this action as a class action pursuant to Federal Rule of Civil Procedure 23, with Plaintiff appointed as Class Representative and Plaintiff's counsel appointed as Class Counsel;

b. A declaration that GM's No Cost Scheme and Reduced Price Scheme, as applied to warranty and recall compensation for California GM dealers, violate the UCL, California Vehicle Code §§ 3065 and 3065.2, the ADDCA, and constitute a breach of contract;

c. Restitution to Plaintiff and the Class of all amounts by which GM was unjustly enriched as a result of its unlawful business practices, including all warranty compensation that GM failed to pay at the retail parts rate markup required by law, in which Plaintiff and Class earned a vested interest upon completion of the relevant warranty repair work;

d. Disgorgement of all profits GM derived from its unlawful retention of funds that should have been paid to Plaintiff and the Class as warranty compensation;

e. Compensatory damages in an amount to be proven at trial, including the difference between the compensation Plaintiff and the Class should have received and the warranty compensation fees actually received;

f. Statutory damages as permitted under applicable law;

g. Pre-judgment and post-judgment interest at the maximum rate permitted by law;

h. Costs and attorneys' fees; and

i. Such other and further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

101. Plaintiff, on behalf of itself and the proposed Class, hereby demands a trial by jury on all issues so triable.

Dated: September 29, 2026 Respectfully submitted,

By: */s/ Kevin R. Budner*

Kevin R. Budner (State Bar No. 287271)
kbudner@lchb.com
Alison C. Fraerman (State Bar No. 351981)
afraerman@lchb.com
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: 415.956.1000
Facsimile: 415.956.1008

*Attorneys for Plaintiff Allen Gwynn Chevrolet, Inc.*